**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RETROPHIN, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>QUESTCOR PHARMACEUTICALS, INC., a California Corporation,<br><br>Defendant. | Case No. 1:15-mc-00537-AK<br>Assigned to : Judge Alan Kay<br>Assign. Date: May 1, 2015<br>Description: Miscellaneous<br><br>United States District Court for the Central District of California, Southern Division<br>Case No. 8:14-cv-00026-JLS (JPR)<br><br>**ORAL ARGUMENT REQUESTED**<br>**[LCvR 7(f)]**<br><br>**FILED UNDER SEAL** |

**CERIUM PHARMACEUTICALS' OPPOSITION TO QUESTCOR'S MOTION TO
COMPEL FURTHER PRODUCTION IN RESPONSE TO QUESTCOR'S SUBPOENA
[REDACTED]**

## CONTENTS

INTRODUCTION ................................................................................................................3

PERTINENT FACTUAL BACKGROUND ......................................................................4

    I.    Questcor Dominates the Market for Infantile Spasms and Nephrotic Syndrom with its Primary Product—Acthar Gel. ...............................................................................4

    II.   Cerium Is a Small Startup With Limited Resources. ...............................................4

    III.  Cerium Is Developing a Confidential Drug Development Project .........................5

    IV.  Retrophin Sues Questcor For Anti-Competitive Conduct—Acquiring Synacthen, a Synthetic Alternative to Acthar Gel. .......................................................................5

    V.   Cerium Confidentially Produced Documents to the FTC, which is Investigating Questcor's Acquisition of Synacthen. .......................................................................6

    VI.  Cerium Has Cooperated with the Subpoena, But Refuses to Turn Over Its Confidential Information or Incur the Significant Expenses that Questcor's Subpoena Demands. .................................................................................................7

ARGUMENT .....................................................................................................................8

    I.    Cerium's Trade Secrets Should Not Be Disclosed to its competitors Questcor or Retrophin. ...............................................................................................................8

          A.   Cerium's Information Is Protectable as a Trade Secret or as Confidential Information. .......................................................................9

          B.   Questcor Has Not Shown a "Substantial Need" For the Material That Cannot Be Otherwise Met Without "Undue Hardship."...........................10

          C.   The Subpoena Should be Quashed Because the Harm to Cerium From Disclosure of the Trade Secret Outweighs the Value of the Discovery. ...18

          D.   If the Court Orders Disclosure, It Should Order Additional Briefing on the Amount of Reasonable Compensation Questcor Must Pay. ...............18

    II.   Questcor Should Bear the Cost of Additional Discovery in Response to Its Subpoena. ...............................................................................................................19

          A.   Questcor's Subpoena Imposes a Significant Expense on Cerium. ...........20

          B.   This Court Must Protect Cerium from the Significant Expense of Compliance by Ordering Questcor to Pay for the Cost of Reviewing Cerium's FTC Production for Confidential Information. ...........................22

CONCLUSION...................................................................................................................24

## INTRODUCTION

Cerium has a secret drug development project. The project is valuable because of its secrecy. Disclosing the project to Questcor and Retrophin, Cerium's primary competitors, would destroy the secret's value. The mere fact of disclosure, even to the parties' outside counsel under strict protections, would prevent Cerium from obtaining the necessary financing to develop the project into a marketable product. Further, the Protective Order in the underlying litigation does not prevent the parties from publicly disclosing Cerium's project at trial or guarantee that information about Cerium's project will remain under seal if offered in support of dispositive motions. Granting Questcor's motion will kill the project before Cerium has a chance to make it viable. Questcor has not, and cannot, establish that it has a "substantial need" for disclosure of Cerium's project, which is still years away from maturing into a competitive product and thus has minimal, if any, relevance to the underlying lawsuit. Therefore, the subpoena should be quashed to the extent it requires disclosure of Cerium's secret.

Relatedly, Cerium's prior confidential production of documents to the FTC contains information that would clue in Questcor and Retrophin as to the nature of Cerium's project. Thus, the Court should order that Questcor bear the cost that Cerium must incur to review and redact documents it produced to the FTC. Cerium is a small company with limited resources. It produced documents to the FTC without extensively reviewing and redacting them to avoid the significant expense involved. Because Questcor now demands Cerium produce all of those documents in response to this subpoena, Cerium would need to manually review and redact the production, a process it estimates will cost hundreds of thousands of dollars. Under Rule 45, this Court must protect Cerium from that significant expense by ordering Questcor to bear the cost of review.

3

## PERTINENT FACTUAL BACKGROUND

### I.     QUESTCOR DOMINATES THE MARKET FOR INFANTILE SPASMS AND NEPHROTIC SYNDROM WITH ITS PRIMARY PRODUCT—ACTHAR GEL.

Questcor Pharmaceuticals, Inc. sells Acthar Gel, the only FDA approved therapeutic preparation of adrenocorticotropic hormone ("ACTH"). Declaration of Rocky Tsai in support of Questcor's Motion to Compel ("RTD") Ex. N (Complaint) ¶ 35. Acthar Gel is porcine-derived, i.e., made from pigs. *Id.* Ex. N ¶ 47. Acthar Gel is used to treat infantile spasms and as a drug of last resort for nephrotic syndrome. *Id.* Ex. N ¶¶ 19–20. In 2007, Questcor raised the price of a vial of Acthar Gel from $1,650 to $23,000. *Id.* Ex. N ¶ 36. In 2014, Questcor sold each vial of Acthar Gel for $28,000. RTD Ex. N ¶ 22. Approximately 95% of Questcor's net sales are from Acthar Gel. Declaration of Sebastian Kaplan in support of Cerium's opposition to Questcor's Motion to Compel ("SKD") Ex. 1. In 2014, Mallinckrodt plc acquired Questcor in a cash and stock transaction valued at approximately $5.8 billion. SKD Ex. 2. As of today, Mallinckrodt's market capitalization is approximately $15 billion. *Id.* Ex. 3.

In 2013, Questcor acquired Synacthen, a synthetic ACTH, from Novartis. Questcor's Motion to Compel Further Subpoena Responses from Cerium ("MTC") at 10. Synacthen has been used for years in Europe and other countries for the same indications as Acthar Gel. RTD Ex. N ¶ 46. To date, it does not appear that Questcor has begun any clinical trials of Synacthen. Declaration of Gregg Lapointe in support of Cerium's Opposition to Questcor's Motion to Compel ("GLD") ¶ 6.

### II.    CERIUM IS A SMALL STARTUP WITH LIMITED RESOURCES.

Cerium Pharmaceuticals is a small company devoted to developing orphan drugs—drugs that will treat diseases that affect fewer than 200,000 people in the United States. GLD ¶ 2. Cerium's team has three primary members and no employees. *Id.* ¶ 3. In 2012 and 2013,

Cerium bid for Synacthen, along with other smaller companies, including Retrophin.  MTC at 4; GLD ¶ 4.  Cerium ultimately lost the bid to Questcor, which paid a significantly higher price than Cerium was offering.  GLD ¶ 4.

## III.   CERIUM IS DEVELOPING A CONFIDENTIAL DRUG DEVELOPMENT PROJECT

Cerium has a drug development project (the "Project") that may eventually mature into a product that would compete with Acthar Gel.  Cerium will be irreparably harmed if forced to disclose any details of its Project to Questcor or Retrophin, including to their outside counsel.  In fact, Cerium believes that, given the resources available to Questcor (now Mallinckrodt), even disclosing the contours of its Project in this Opposition would unacceptably risk Questcor reverse-engineering the key insights of the Project.  If the Court deems it necessary to further understand the Project, Cerium requests leave to present the details of the Project in an *ex parte*, *in camera* hearing.

Cerium will disclose the following facts to support its opposition to this Motion: Cerium has yet to secure funding for the Project, but is actively courting investors.  GLD ¶ 5, 7.  Even after Cerium secures funding, it expects the Project will take years to mature into a marketable product.  *Id.* ¶ 9.  The Project will involve developing a drug that will require FDA approval, which is in no way guaranteed.  *Id.*  The Project is not likely to lead to Cerium obtaining exclusive rights to a competitive product.  *Id.* ¶ 9–10.  Thus, the value of the Project comes from the advantage that Cerium will gain from being the first to market following FDA approval, which turns upon preservation of the Project's secrecy.  *Id.* ¶ 10.

## IV.   RETROPHIN SUES QUESTCOR FOR ANTI-COMPETITIVE CONDUCT—ACQUIRING SYNACTHEN, A SYNTHETIC ALTERNATIVE TO ACTHAR GEL.

On January 7, 2014, Retrophin sued Questcor, Case No. 8:14-cv-00026-JLS-JPR, in the

District Court for the Central District of California, alleging causes of action for (1) combination in the restraint of trade in violation of Section 1 of the Sherman Act; (2) monopolization in violation of Section 2 of the Sherman Act; (3) attempted monopolization in violation of Section 2 of the Sherman Act; (4) unlawful merger in violation of Section 7 of the Clayton Act; (5) violation of California antitrust laws; and (6) unfair competition under California Business and Professions Code § 17200.  RTD Ex. N ¶¶ 64–98.  Retrophin seeks declaratory relief, injunctive relief, disgorgement of profits, and damages.  *Id.* (Prayer for Relief) ¶¶ A–Q.  In short, Retrophin alleges that Questcor's acquisition of Synacthen, which would have competed with Acthar Gel, violated antitrust laws.

The district court for the Central District of California denied Questcor's motion to dismiss.  August 8, 2014 Order (Dkt. 21).  Questcor answered the complaint and raised 43 affirmative defenses.  RTD Ex. O.  The court in that case has entered a protective order governing the disclosure of confidential information.  RTD Ex. E.  Fact discovery closes on June 19, 2015.  August 12, 2014 Minute Order (Dkt. 35).

## V.   CERIUM CONFIDENTIALLY PRODUCED DOCUMENTS TO THE FTC, WHICH IS INVESTIGATING QUESTCOR'S ACQUISITION OF SYNACTHEN.

On or around June 11, 2014, Cerium received subpoenas from the Federal Trade Commission regarding Questcor's acquisition of Synacthen.  SKD ¶ 5; RTD Ex. D.  On and after July 10, 2014, Cerium produced 5,909 documents consisting of approximately 39,180 Bates numbered pages (documents produced in native format, such as spreadsheets and presentations, are produced as single Bates numbered file).  SKD ¶ 6.  Cerium collected this document set using search terms, and it did not manually review every document before providing them to the FTC.  *Id.* ¶ 7; RTD Ex. K (Apr. 21, 2015 Kaplan Email to Tsai).  Cerium produced these documents to the FTC under the FTC's confidentiality provisions, including relevant provisions

of the FTC Act, 15 U.S.C. §§ 46(f), 57b-2(a-f), FOIA exemptions three, 552(b)(3), (4), and (7), and all other applicable statutes, regulations, and customary confidentiality policies. *Id.* ¶ 8. Subsequently, Cerium has agreed to permit the California, Maryland, and Texas Attorneys General to obtain the materials subject to similar confidentiality restrictions. *Id.* ¶ 9. The FTC has not yet filed a formal complaint against Questcor. *Id.* ¶ 10.

## VI.   CERIUM HAS COOPERATED WITH THE SUBPOENA, BUT REFUSES TO TURN OVER ITS CONFIDENTIAL INFORMATION OR INCUR THE SIGNIFICANT EXPENSES THAT QUESTCOR'S SUBPOENA DEMANDS.

Questcor served a subpoena on Cerium dated November 20, 2014. RTD Ex. A. Cerium served its objections and responses dated December 4, 2014. RTD Ex. B. On December 30, 2014, Questcor's counsel agreed to limit the scope of the subpoena to three categories:

1.      Cerium's negotiation/deal-related documents sufficient to show the arc of its bidding for Synacthen.

2.      Cerium's prior production to the FTC in response to the FTC's requests for documents related to the Synacthen transaction.

3.      Documents sufficient to show how Cerium projected the pathway to approval and entry for Synacthen's projected indications.

RTD Ex. G (Dec. 30, 2014 Tsai Email to Kaplan). Cerium agreed to produce documents responsive to categories one and three, and objected to producing documents responsive to category two—Cerium's prior production to the FTC. RTD Ex. G (Jan. 12, 2015 Kaplan Email to Tsai, containing a typo—the email should refer to Questcor's *first* and third categories); Ex. J (Jan. 22, 2015 Kaplan Letter to Tsai). On or around February 9, 2015, Cerium produced responsive documents to categories one and three, consisting of 26 documents, with Bates numbered pages CERIUM-QCORRPHINSUBP00000001–999. SKD ¶ 11. Questcor is not

challenging the sufficiency of Cerium's production regarding those two categories,[1] except to the extent that Cerium redacted trade secret and confidential information from a January 18, 2013 presentation produced as CERIUM-QCORRPHINSUBP00000001–41 ("Investor Presentation"). Cerium produced the Investor Presentation because it contains information relevant to category three—Cerium's projected pathway to approval and entry for Synacthen's projected indications. The Investor Presentation also contained information about the Project. Cerium redacted this information because it was (a) not responsive to category three, and (b) trade secret or confidential.

**ARGUMENT**

Questcor devotes the bulk of its motion to attacking strawman arguments about the relevance of the documents it requests. In fact, there are only two issues this Court needs to decide: (1) whether Cerium should be compelled to turn over its confidential Project to its primary competitors, and initially to their outside counsel; and (2) whether Questcor should bear the expense for Cerium to review and redact its prior production of documents to the FTC.

## I.   CERIUM'S TRADE SECRETS SHOULD NOT BE DISCLOSED TO ITS COMPETITORS QUESTCOR OR RETROPHIN.

Federal Rule of Civil Procedure 45(d)(3)(B)(i) authorizes this Court to quash or modify a subpoena if the subpoena requires "disclosing a trade secret or other confidential research, development, or commercial information." Questcor's subpoena seeks Cerium's trade secret or otherwise confidential information about its drug development Project. The subpoena should therefore be modified to exclude production of information about Cerium's Project, consistent

---

[1] Questcor mentions in its motion that Cerium has not produced any email. MTC at 6. This is a red herring. During the meet and confer process, Questcor's counsel specifically stated he was not interested in emails concerning the bidding process or Cerium's projected pathway to approval for Synacthen. SKD ¶ 13. Moreover, Questcor notably fails to explain any need it may have for Cerium's emails.

8

with the production of documents Cerium has already made.

### A.   Cerium's Information Is Protectable as a Trade Secret or as Confidential Information.

Cerium's Project is a protectable trade secret.  Under Maryland law, a trade secret means "information" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Md. Comm. Code § 11-1201(e)(1); *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 609 (D. Md. 2002); *Cash Money Cars, LLC v. Carmax of Laurel, LLC*, No. 0769 (Md. Sp. App. Dec. 29, 2014).[2]  Cerium's Project derives potential independent economic value from not being generally known or readily ascertainable by others.  The secrecy of the Project would allow Cerium to bring a drug to market faster than competitors, while disclosure of the Project would eliminate that value.  *See* GLD ¶ 10.  Further, Cerium has maintained the secrecy of the Project.  Cerium has only disclosed information concerning the Project to other persons (who notably are not competitors or their counsel) under confidentiality protections.  GLD ¶ 8.  Such efforts to maintain the secrecy of the Project are reasonable: the "necessary element of secrecy is not lost [] if the holder of the trade secret reveals the trade secret to another in confidence, and under an implied obligation not to use or disclose it."  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) (interpreting Ohio law); *see also Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993) (holding limited disclosure made in confidence did not waive trade secret protection); *Jaymar-Ruby, Inc. v. F.T.C.*, 496 F. Supp. 838, 842-43 (N.D. Ind. 1980) *aff'd*, 651 F.2d 506 (7th

---

[2] Because Cerium is based in Maryland, Maryland's trade secret law applies.  Further, Cerium is not aware of any relevant substantive difference between the trade secret law of Maryland and the District of Columbia.

9

Cir. 1981) (describing one of the purposes of the FTC Improvements Act as "to remove the possibility that sensitive material obtained pursuant to subpoena . . . would be released under the FOIA or otherwise 'made public'" ). Even if Cerium's Project did not qualify for trade secret protection, it would still qualify as "other confidential research, development, or commercial information" under Rule 45(d)(3)(B)(i) because it has not been disclosed to others except confidentially.[3]  During the meet and confer process, Questcor did not contend that Cerium's Project should not be afforded trade secret or confidentiality protections.  SKD ¶ 13.  Thus, this Court may quash the subpoena under Federal Rule of Civil Procedure 45(d)(3)(B)(i).

**B.     Questcor Has Not Shown a "Substantial Need" For the Material That Cannot Be Otherwise Met Without "Undue Hardship."**

Because Questcor's subpoena requires the disclosure of Cerium's trade secret or confidential information, the Court should quash the subpoena unless Questcor (i) "shows a substantial need for the [] material that cannot be otherwise met without undue hardship" and (ii) ". . . reasonably compensate[es]" Cerium.  *See* Fed. R. Civ. P. 45(d)(3)(C).  "If a court determines that the subpoena requests commercial information, the burden shifts to the party seeking the information to show that obtaining the information is both relevant and necessary." *Falicia v. Advanced Tenant Servs., Inc.*, 235 F.R.D. 5, 7 (D.D.C. 2006) (quashing subpoena for lack of jurisdiction); *Cytodyne Technologies, Inc. v. Biogenic Technologies, Inc.*, 216 F.R.D. 533, 536 (M.D. Fla. 2003) (quashing subpoena that requested competitor's trade secret information).

---

[3] To the extent the Court requires further evidence of the confidential or trade secret nature the Project, Cerium requests the Court conduct an *in camera* review of the information and testimony from Cerium's members.

### 1.   Questcor Has Failed to Establish a Substantial Need for the Requested Discovery.

Nowhere in Questcor's brief does it even attempt to establish a substantial need for Cerium's documents—the phrase does not even appear in Questcor's motion.  Questcor focuses entirely on the question of relevance of their discovery requests (Mot. 10–11), but not why Cerium's confidential documents are crucial to Questcor's defenses.  Questcor's failure to meet its burden to establish a substantial need for Cerium's documents is a sufficient basis to quash the subpoena. *See In re Subpoena of DJO, LLC*, 295 F.R.D. 494, 500 (S.D. Cal. 2014) (partially quashing subpoena, holding serving party failed to establish substantial need for discovery); *DISH Network, L.L.C. v. WNET*, No. 13-CV-00832-PAB-KLM, 2014 WL 1628132, at *10 (D. Colo. Apr. 24, 2014) (quashing subpoena for failure to show substantial need).

"Whether the information sought is necessary to the case is satisfied where the party's claim or defense virtually rises or falls with the admission or exclusion of the proffered evidence.  The determination of substantial need is especially important in the context of enforcing a subpoena where confidential commercial information is sought from a non-party." *Edwards v. California Dairies, Inc.*, No. 1:14-MC-00007-SAB, 2014 WL 2465934, at *5 (E.D. Cal. June 2, 2014) *reconsideration denied*, No. 1:14-MC-00007-SAB, 2014 WL 3420991 (E.D. Cal. July 14, 2014) (denying motion to compel subpoena where serving party failed to show substantial need for confidential information) (internal quotation marks and citations omitted).

Questcor cannot show any substantial need for Cerium's information because Cerium's nascent Project is too remote to affect Retrophin's claims or Questcor's defenses.  The Project is not even in its infancy.  Cerium has yet to obtain funding for the Project.  GLD ¶ 5.  When it does, Cerium expects the project to take substantial time and money and to require FDA approval, which is not guaranteed. *Id.* ¶ 9.  Questcor has cited to no law or other authority for the proposition that an unrealized business idea is even probative, not to mention crucial, to the relevant market analysis for antitrust claims, or any other issue raised by Retrophin's complaint.

11

Further, Questcor is already aware of other, more proximate, competitors in the relevant markets. Plaintiff Retrophin has alleged in its complaint that it is "trying to create from scratch a drug – that it has designated as RE-034 – that will match Synacthen." RTD Ex. N ¶¶ 57–60. Further, Questcor has stated in its 2013 Annual Report that:

> The pharmaceutical and biotechnology industries are intensely competitive and subject to rapid and significant technological change. There are products and treatments currently on the market that compete with Acthar. In addition, a number of companies are pursuing the development of pharmaceuticals and products that target the same diseases and conditions for which Acthar is currently approved to treat or which we may seek to add to the label of approved indications for Acthar. There are also products and treatments in other parts of the world that could be introduced into the United States following FDA approval.

SKD Ex. 1 at 6. It is implausible that Questcor's defense would rise and fall based on Cerium's nascent Project, when Questcor is already aware of a "number of companies" that are pursuing development of competitive drugs.

### 2. Disclosure of the Information Would Cause Cerium Undue Hardship.

Disclosure of Cerium's Project to its competitors, Questcor and Retrophin, would cause Cerium enormous harm. "[C]ourts have acknowledged that disclosure of confidential information to a competitor is presumed to be harmful to the disclosing entity." *Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*, 216 F.R.D. 533, 535 (M.D. Fla. 2003); *see also Am. Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 741 (Fed. Cir. 1987) (affirming order quashing subpoena for competitor's trade secrets). Cerium's competitors include Questcor and Retrophin, therefore, the presumption of harm is sufficient for Cerium to satisfy this element. Further, disclosure of the information would substantially impair, and likely destroy, Cerium's ability to obtain funding for its Project, thus eliminating the business value of the information entirely. Declaration of Peter Collum in support of Cerium's Opposition to Questcor's Motion to Compel ("PCD") ¶ 6–8; GLD ¶ 7.

12

3. **Questcor's Protective Order Does Not Adequately Secure the Confidentiality of Cerium's Trade Secret.**

a. **The Fact of Disclosure to Questcor and Retrophin's Outside Counsel Would Destroy Cerium's Ability to Secure Funding for the Project.**

Cerium objects to the disclosure of its Project, even to outside counsel, because it would cause specific and immediate harm. The mere fact of disclosure to the Parties' outside counsel would deter potential investors from funding the Project. PCD ¶ 6–7. This is not surprising: given the inherent risk involved in funding a drug development program, the additional risk that Mallinckrodt/Questcor might obtain clues about Cerium's Project from its outside counsel and bring its massive resources to bear to beat Cerium to the market or otherwise take adverse action will induce potential investors to look for other opportunities that do not bear such risk. While Cerium's confidential documents may never be transmitted to or shown to the Parties in this case, there is an ever-present risk that the thrust of Cerium's plan could be inadvertently referenced or disclosed during attorney-client discussions. Even an oblique, high-level mention of Cerium's plans to these competitors could destroy all Project value. In fact, Cerium's outside consultants, who liaise with potential investors, will no longer be interested in assisting Cerium advance the Project if this Court compels Cerium to disclose this information under any conditions. PCD ¶ 8. Cerium would suffer this harm immediately. The harm of lost financing is not contingent on the Parties actually disclosing Cerium's information; merely the perception that they might do so will cause Cerium undue harm.

Questcor cites no authority for its blanket assertion that the Protective Order per se obviates Cerium's objections to disclosure. To the contrary, its two cited cases are irrelevant or distinguishable. In *United States v. Microsoft Corp.*, 165 F.3d 952, 953 (D.C. Cir. 1999), the court affirmed a district court order effectively requiring the deposition of Bill Gates to be made

13

public in the government's antitrust suit against Microsoft. In that case, the circuit court held that the trade secrets protection of Rule 26(c) did not conflict with 15 U.S.C. § 30, which requires that government depositions be made public. Questcor cites *Microsoft* for its noncontroversial quotation of the Advisory Committee Note to the 1991 Amendments to Rule 26, which stated that trade secret protections should be weighed on a case-by-case basis. *Microsoft* does not support Questcor's position.

Questcor also relies on *Albany Molecular Research, Inc. v. Schloemer*, 274 F.R.D. 22 (D.D.C. 2011), which is readily distinguishable. In *Albany Molecular*, parties to two underlying litigations moved to quash a subpoena to the FDA that sought the moving parties' own confidential information. The court held that the movants had not established disclosure of their information would "significantly affect the financial health and well-being of the company if disclosed," and that the stipulated protective order in one of the underlying cases offered additional protections from disclosure. *Id.* at 26–27. On the facts, *Albany Molecular* is distinguishable because (1) it did not involve a nonparty to the underlying litigation (*Id.* at 24); and (2) the parties were not direct competitors (*Id.* at 26). Further, the movants did not argue that the mere perception or threat of disclosure would cause them any harm. Thus, *Albany Molecular* does not support Questcor's position either.

### b. The Protective Order Does Not Adequately Protect Cerium From the Intentional Disclosure of Its Project.

In addition to the harm caused by the perception of disclosure, the Protective Order creates a substantial risk that Cerium's Project would actually be disclosed to the parties, not merely their outside counsel. First, the Protective Order does not govern how Cerium's information will be treated at trial, and permits the Parties (not Cerium) to seek less protection of Cerium's information at trial, a hearing, or other proceedings. Second, the Protective Order

14

permits the Parties' outside counsel to generally advise the Parties of information they learn from Cerium, which risks disclosure of the Project.

On its face, the Protective Order does not protect Cerium's information from disclosure at trial. Paragraph 1 of the Protective Order states: "Any use of Protected Material at trial in this Action shall be governed by a separate agreement or order." RTD Ex. E. Paragraph 17 states: "Nothing herein shall prevent any party from seeking from the Court further, greater, or lesser protection with respect to the use of any Protected Materials in connection with any trial, hearing, or other proceeding in the Action." RTD Ex. E. Thus, this Protective Order is similar to the one at issue in *Micro Motion, Inc. v. Kane Steel Co., Inc.,* 894 F.2d 1318 (Fed. Cir. 1990), which addressed another California protective order. The Federal Circuit held that because "[t]he California court retains authority to decide what materials are properly deemed 'confidential' and what part of the trial shall be *in camera,*" then "[i]t would be divorced from reality to believe that either party here would serve as the champion of its [nonparty] competitor [] either to maintain the confidentiality designation or to limit public disclosure as much as possible during trial. [The nonparty competitor] would, in fact, lose all control of the situation since disclosure of its information depends on the action by a court before whom it has no standing." *Id.* at 1325. The Federal Circuit held the district court abused its discretion in denying the nonparty competitor's motion to quash the subpoena of confidential information. *Id.* at 1328.

In *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 530 (D. Del. 2002), the court quashed a subpoena even though documents could have been produced subject to an outside attorneys' eyes only provision. The court noted that the protective order did not govern the use of confidential information at trial. That court held: "Although the protective

order allows the designation by [the nonparty] that such information is confidential and limits

initial disclosure to outside counsel, the parties to this litigation are left with the option of how

disclosure of such confidential information is handled at trial. As a result, control is in the hands

of [the nonparty's] undisputed competitors and the court." *Id.* at 530. The court concluded that

"potential harm exists" from the requested disclosure. *Id.* Similarly, Cerium faces the potential

harm that its Project may be disclosed at trial even if it limits the initial disclosure to its

competitors' outside counsel. *Accord Allen v. Howmedica Leibinger, GmhH*, 190 F.R.D. 518,

526 (W.D. Tenn. 1999) (holding protective order would not protect nonparty's confidential

information at trial).

      The Protective Order contains a further loophole: Paragraph 22 permits Questcor and

Retrophin's outside counsel to refer to or rely generally on confidential information in rendering

advice to their clients regarding the litigation or "general advice in the area of

adrenocorticotropic hormones [or analogues]" so long as the attorneys do not disclose the

"contents" of confidential material. Although this provision may offer sufficient protection for

trade secrets involving customer lists or financial information, where the line between general

advice and the specific contents of documents is clear, there is no meaningful delineation

between the general contours of Cerium's Project and the specific contents of the documents

detailing the Project. Even a high-level disclosure likely destroys Cerium's prospects for

Project success. Moreover, to borrow from *Micro Motion*, it would be "divorced from reality" to

believe that Questcor and Retrophin's counsel would "champion" Cerium's interest in policing

that line. In fact, Questcor and Retrophin's counsel, lacking a scientific grounding in the

nuances of adrenocorticotropic hormones and their analogues, may not even be aware of what

aspects of Cerium's Project would put their clients on the path to uncovering the Project, and

thus may disclose crucial identifying information inadvertently.  As some commentators have put it: "Notwithstanding that parties typically enter into protective orders providing that highly confidential information may be designated as 'attorneys' eyes only' to prevent the defendant from learning the plaintiff's trade secrets, there is a widely held belief among practitioners that such protective orders are susceptible to 'leakage.'"  David Quinto and Stuart Singer, TRADE SECRETS: LAW AND PRACTICE 97 (2d ed. 2012).

For these reasons, Questcor's reliance on *Albany Molecular* is even more misplaced. There is no reason to believe that the protective order at issue in that case contained the loopholes that exist in the protective order in this case or those orders in *Micro Motion* and *Mannington Mills*, and the concerns about the parties not "championing" the confidentiality of nonparty information did not apply in *Albany Molecular* because the movants were themselves parties to the underlying litigations.

### c.     The Protective Order Cannot Guarantee Against Inadvertent Disclosure by the Parties or the Court.

Finally, the risk of inadvertent disclosure of Cerium's information tilts the scales against disclosure of Cerium's Project. Examples abound where litigants or even courts accidentally disclose confidential information to the public. Only two months ago, a court clerk in California failed to keep documents showing confidential settlement amounts under seal. SKD ¶ 14, Ex. 4. Recently, a top national law firm was chastised for inadvertently disclosing confidential information to its client, primarily by failing to sufficiently redact confidential information in documents it shared. SKD ¶ 15, Ex. 5. It is not difficult to find other examples of disclosures despite the existence of protective orders. *See id.* ¶ 15–16. In *In re Zyprexa Injunction*, 474 F. Supp. 2d 385 (E.D.N.Y. 2007), a reporter worked with an expert and another attorney to obtain documents that Eli Lilly had produced confidentially in a multidistrict products liability action,

and published excerpts from those documents in the New York Times. It is not beyond

imagination that the Gray Lady would be interested in this litigation as well, as it has already

published multiple articles investigating Questcor's pricing of Acthar Gel at $28,000 per vial.

*See* SKD ¶ 18–19, Exs. 8–9. This Court should weigh the risk of an inadvertent disclosure of

Cerium's Project in determining whether the Protective Order adequately protects Cerium.

## C. The Subpoena Should be Quashed Because the Harm to Cerium From Disclosure of the Trade Secret Outweighs the Value of the Discovery.

Even if this Court finds Questcor has established a substantial need for the requested

discovery, it should still quash the subpoena because the harm to Cerium outweighs any need

Questcor has for Cerium's Project. Cerium's status as a nonparty, direct competitor with the

Parties in this litigation weighs strongly against disclosure. *See DISH Network, L.L.C.*, 2014 WL

1628132, at *9 (holding courts should be especially cautious of ordering disclosure of nonparty

trade secrets in order quashing subpoenas to nonparty Dish). The risk that Cerium will lose the

opportunity to secure funding for its Project, and the commercial harm it would suffer as a result,

outweighs the value to Questcor of offering into evidence one more potential, long-shot, distant-

future source of competition. In fact, disclosure of the Project to Questcor and Retrophin would

paradoxically destroy any probative value the Project may have. Once the Project was disclosed,

Cerium would no longer be able to secure funding for it, and thus it would no longer be even a

potential source of competition.

## D. If the Court Orders Disclosure, It Should Order Additional Briefing on the Amount of Reasonable Compensation Questcor Must Pay.

Finally, even if Questcor could establish that it had a substantial need for Cerium's

information that outweighed the hardship of disclosure, Rule 45(d)(3)(C)(ii) would still require

that Questcor ensure that Cerium "be reasonably compensated." In *Klay v. All Defendants*, 425

F.3d 977, 985 (11th Cir. 2005), a leading case on reasonable compensation for disclosure of

18

trade secrets under Rule 45, the court looked to jurisprudence on government takings to determine what constituted reasonable compensation. The court held: "The gain to the party seeking confidential information through a subpoena is not the measure of compensation reasonably owed to the owner of that information. The measure is the loss to the owner of the property." *Id.* at 985. Ultimately, the court in *Klay* held that disclosure in that case did not require compensation because disclosure under a protective order would not deprive the subpoenaed entity of the value of its intellectual property. Here, however, disclosure would deprive Cerium of the value of its trade secret. Thus, in the event this Court orders disclosure, it must ensure that Cerium is reasonably compensated the value of its trade secret information.

Cerium estimates that if it successfully developed the Project into a viable product, it would realize hundreds of millions of dollars in profit over the several years following entry to the market. GLD ¶ 11. The reasonable compensation for Cerium to disclose its idea would be, essentially, the amount of money that Cerium would be willing to accept to sell the Project. Cerium has not, to date, performed the necessary analysis to value the price at which it would be willing to sell the Project. As a small company, it would be unduly burdensome to assemble and analyze such a valuation package without a compelling reason, i.e., an order from this Court that Questcor must reasonably compensate Cerium in an amount to be decided in further briefing. Therefore, Cerium requests that if the Court orders disclosure of the Project to Questcor, then Cerium and Questcor be granted leave to file additional briefing on the amount of reasonable compensation.

## II.   QUESTCOR SHOULD BEAR THE COST OF ADDITIONAL DISCOVERY IN RESPONSE TO ITS SUBPOENA.

Federal Rule of Civil Procedure 45(d) requires this Court to quash or modify a subpoena that "subjects a person to undue burden" and further requires this Court protect Cerium from

19

"significant expense." Questcor's subpoena subjects Cerium to an undue burden and significant expense—the time and cost of manually reviewing thousands of documents produced without prior review to the FTC.[4]  Before producing documents to Questcor, Cerium would need to review each document to determine whether it contained any confidential information about Cerium's Project.  Cerium estimates the cost of such a review and production to be $230,000. Under Rule 45(d)(1), this Court must enforce Questcor's duty to avoid imposing an undue burden or expense on Cerium.  Further, under Rule 45(d)(2)(B)(ii), this Court's order "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."

### A.      Questcor's Subpoena Imposes a Significant Expense on Cerium.

#### 1.      Cerium Would Be Forced to Spend Approximately $230,000 to Review and Produce Responsive Documents.

Cerium estimates that reviewing the documents it produced to the FTC for relevance and confidentiality purposes would require approximately 700 hours and cost approximately $230,000.  SKD ¶ 20.  Cerium did not manually review all of the documents in advance of producing them to the FTC.  SKD ¶ 7–8.  The FTC agreed to this batch-production method for Cerium to produce documents to minimize the cost imposed on Cerium to comply with the FTC's subpoena.  *See* SKD ¶ 8.  Cerium was willing to forego a document-by-document review because it was assured that the documents would remain confidential during the FTC's investigation and that Cerium would have the option to object to the disclosure of its documents in the event that the FTC did file a complaint against Questcor.  SKD ¶ 8.  Hence, Cerium does not know which documents are responsive to which specifications in the FTC's subpoena nor

---

[4] Questcor devotes substantial space in its motion to explaining how it has narrowed its requests during the meet and confer process.  *E.g.*, Mot. at 5.  Questcor's point is a non-sequitur; Cerium's objection is not based on overbreadth, but on Questcor's refusal to protect Cerium from the "significant expense" of reviewing its production to the FTC.

which documents contain confidential information.

To comply with Questcor's request, Cerium would need to review its entire production to the FTC for relevance and confidentiality. Cerium produced 5,909 documents to the FTC, totaling 39,180 Bates numbered pages. SKD ¶ 6. It would require on average approximately 1 minute per page to review ordinary documents, and approximately 5 minutes per spreadsheet and presentation. SKD ¶ 21. These estimates are based on reasonable and competitive review rates that Cerium's counsel regularly uses to budget for document review projects. SKD ¶ 21. Cerium's outside counsel would charge Cerium ███████ for dedicated document review attorneys. SKD ¶ 22. This is a reasonable and competitive market rate. *Id.* Thus, the cost for merely taking a single pass at the documents would be approximately ███████. SKD ¶ 23.

| | Pages/ Documents | Hours | Cost |
|---|---|---|---|
| **Documents** | 38,777 pages | 646.28 | ███████ |
| **Presentations** | 229 documents | 19.08 | ███████ |
| **Spreadsheets** | 174 documents | 14.50 | ███████ |
| **Total** | | 680 | ███████ |

There would be additional costs for training, conferring regarding the relevance or confidentiality of documents, redacting documents containing confidential information, quality control review, and other standard costs involved with document review. SKD ¶ 24. Cerium estimates these costs would run approximately ██████ for a team of nine reviewers and one supervisor working over two weeks. *Id.* To complete 680 hours of review, Cerium would need nine reviewers working 38 hours a week for two weeks. SKD ¶ 25. (Questcor demands that Cerium turn over its documents in 7 days, which would require substantial additional costs of training and overtime). *Id.*

Even using much more conservative estimates, the cost of the review would still be

21

unduly burdensome. Some e-discovery vendors estimate that reviewers can code 20–50 documents per hour. SKD ¶ 26. At the extremes of those rates, the review would cost approximately ▮▮▮▮▮▮▮▮▮▮▮▮ respectively,[5] plus the additional training and other costs identified above. But because Cerium would need to have each page of its documents reviewed for confidentiality, it considers its per-page estimate more accurate.

Whether the review would cost around $50,000 or over $200,000, such an expense would be an undue burden on Cerium, a small company with only three members struggling to obtain funding.

**B.    This Court Must Protect Cerium from the Significant Expense of Compliance by Ordering Questcor to Pay for the Cost of Reviewing Cerium's FTC Production for Confidential Information.**

Rule 45(d)(3)(A)(iv) *requires* this Court to quash or modify a subpoena that causes undue burden on a nonparty. The D.C. Circuit has recognized that cost shifting is mandatory if a subpoena imposes significant expenses on a nonparty. *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) ("The [plaintiffs] claim the court erred in concluding that fee shifting was mandatory. But Rule 45 requires precisely that—the district court 'shall protect' a non-party from 'significant expense.'"). The expected cost of Cerium's compliance is clearly significant. *Id.* at 182 ("the district court here was well within bounds in treating expenses of nearly $200,000 as 'significant'"); *Williams v. City of Dallas*, 178 F.R.D. 103, 113 (N.D. Tex.1998) ($9,000 estimate sufficiently significant to shift costs).

Questcor's argument that attorneys' fees are not subject to cost-shifting is contrary to the law. MTC at 14. The case law is replete with examples of courts shifting attorneys' fees to the requesting party. *E.g.*, *In re Subpoena of Am. Nurses Ass'n*, 924 F. Supp. 2d 607, 626 (D. Md.

---

[5] These figures are based on the following calculation: ((Number of documents)/(Documents reviewed per hour))*(Hourly Rate for Reviewing Attorney).

2013) objections overruled, No. 08-CV-0378, 2013 WL 5741242 (D. Md. Aug. 8, 2013)

(ordering the subpoenaed party to submit a motion for an award of costs *and fees* for responding

to a subpoena); *Georgia-Pac. LLC v. Am. Int'l Specialty Lines Ins. Co.*, 278 F.R.D. 187, 190

(S.D. Ohio 2010) ("A non-party's legal fees, particularly where the services benefit the

requesting party, are considered an expense which is reimbursable under Rule 45(c)(2)(B).").[6]

    Questcor's solitary reliance on *Phillips Petroleum Co. v. Pickens*, 105 F.R.D. 545, 550

(N.D. Tex. 1984) on this point is bizarre. That case was decided before the major revisions of

Rule 45 in 1991, which added the provisions *mandating* cost-shifting of expenses. Under Rule

45(d)(2)(B)(ii), this Court "must protect a person who is neither a party nor a party's officer from

significant expense resulting from compliance." The rule does not carve out attorneys' fees. To

the contrary, the Rule uses the term "expenses" not "costs." Even if *Pickens* correctly stated the

law for this Court as of 1984, it has no force following the 1991 revisions to Rule 45.

    In determining the percentage allocation of compliance expenses, Courts generally look

to three factors: (1) whether the nonparty has an interest in the underlying litigation; (2) whether

the underlying litigation is of public importance; and (3) whether the nonparty respondent can

more readily bear the costs of production than the requesting party. *See In re Exxon Valdez*, 142

F.R.D. 380, 383 (D.D.C. 1992) (holding the nonparty respondent should bear a portion of costs

equivalent to the profits it received from the defendant in the underlying litigation). Here, the

factors weigh in favor of shifting the entire burden of production to Questcor. First, Cerium has

no interest in the underlying litigation. Second, the public interest factor does not apply because

this is not a case where a party is seeking to avoid an expense in pursuit of litigation in the public

interest. Third, Questcor is massively larger than Cerium and in a far better position to bear the

---

[6] In 2013, Rule 45 was amended so that the provisions of former Rule 45(c) were moved to 45(d).

costs of production. Thus, the full amount of Cerium's expenses should be borne by Questcor. *See Georgia-Pac. LLC*, 278 F.R.D. at 190 ("the entire tenor of Rule 45 is to prohibit a party from shifting its litigation expenses to a non-party.").

## CONCLUSION

Questcor is not entitled to take Cerium's Project by force of subpoena. It has failed to meet its burden of showing a substantial need for that information and cannot overcome the harm that Cerium would suffer by disclosure even to the Parties' outside counsel. Thus, the subpoena should be quashed with respect to Cerium's confidential information and Questcor should bear the cost of Cerium reviewing and redacting its prior production to the FTC in order to remove its confidential information.

Dated: May 22, 2015

Respectfully submitted,

**SHULMAN, ROGERS, GANDAL,
PORDY & ECKER, P.A.**

By:           /s/ Jeremy W. Schulman
Jeremy W. Schulman (Fed. Bar No. 481755)
12505 Park Potomac Avenue, Sixth Floor
Potomac, Maryland  20854-6803
Tel.:  (301) 230-5200
Fax:  (301) 230-2891
Email:  jschulman@shulmanrogers.com

Ilana Rubel (*pro hac vice application
pending*)
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94104
Telephone: 650.988.8500
Facsimile:    650.938.5200

Sebastian E. Kaplan (*pro hac vice
application* pending)
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone: 415.875.2300
Facsimile:  415.281.1350

*Counsel for Non-Party Cerium
Pharmaceuticals, Inc.*